UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICHOLAS MITCHELL,

    Petitioner,

v.

HAROLD WHITE,

    Respondent,
_____/

Civil No. 04-CV-70865-DT
HONORABLE GERALD E. ROSEN
UNITED STATES DISTRICT JUDGE

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Nicholas Mitchell, ("petitioner"), presently confined at the Parnall Correctional Facility in Jackson, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his *pro se* application, petitioner challenges his conviction on one count of armed robbery, M.C.L.A. 750.529; M.S.A. 28.797; one count of carjacking, M.C.L.A. 750.529a; M.S.A. 28.797(a); and being a second felony habitual offender, M.C.L.A. 769.10; M.S.A. 28.1082. For the reasons stated below, the application for a writ of habeas corpus is **DENIED**.

### I. Background

Petitioner's conviction arose from the robbery of a taxicab driver in Kalamazoo, Michigan.

The victim, Chiefthomas Akerityo, was dispatched to a

Meijer's store in Comstock Township, Michigan around midnight on January 16, 2001. Akerityo was told to look for someone named "Rick" or "Rich". When Akerityo arrived at the entrance to the Meijer's, a man approached his car. Akerityo asked the man if he was "Rick" or "Rich", to which the man replied affirmatively. The man got into the taxi. The man asked Akerityo to take him to Leigh Street.

When Akerityo arrived at Leigh Street, the man grabbed Akerityo around the neck and placed a metal object against his head. The man demanded Akerityo's money and then ordered him to get out of the taxicab. Akerityo subsequently called the police.

Deputy Troy Miles was the police officer who spoke with Akerityo. Akerityo described the suspect as being a white male, early 20's, 5'10", average size, with brown hair, no facial hair, wearing a thigh length dark coat and a ball cap.

Other police officers who responded to the call found Akerityo's taxicab abandoned in a parking lot near the Meijer's store. A K-9 unit tracked a scent to the southeast corner of the Meijer's parking lot before losing the scent.

Deputy James Sandlin contacted the Meijer's security personnel and asked if he could review the videotapes from

their security surveillance system to see if he could identify a suspect. Sandlin was advised that the camera system was down but that he could review it the next day.

As Sandlin was exiting the store, he observed two men who were walking together. One of the men, later identified as David Oliver, matched the description of the suspect given by Akerityo to a "T". Sandlin spoke to both men, who were cooperative and produced identification. After obtaining information from Oliver, Sandlin permitted him to continue shopping.

Deputy James VanDyken subsequently contacted Oliver, who agreed to participate in a live corporeal lineup. Akerityo viewed the lineup and indicated that none of the individuals in the lineup were the person who had robbed him. At this point, Oliver was cleared as a suspect in the robbery.

Bryan Taylor of Meijer's security ultimately prepared a videotape of Meijer's security surveillance cameras from the night in question and gave it to the police. Deputy VanDyken viewed the videotape and then asked Akerityo to view the videotape. Akerityo viewed the surveillance videotape and indicated that the person on the surveillance videotape was the person who had robbed him.

Deputy VanDyken subsequently focused on two persons who resembled the person in the surveillance videotape, Bryan Root and Robert Kniss. VanDyken arranged a photographic showup containing pictures of Root and Kniss. Akerityo viewed the photographic lineup and did not recognize anyone as being the suspect. Root and Kniss were cleared as suspects.

On February 26, 2001, Bryan Taylor contacted Deputy VanDyken and informed him that he had observed a man who resembled the person from the surveillance videotape enter the Meijer's store on February 24, 2001. Taylor followed the man around the store. The man was wearing the same type of coat as the suspect in the videotape. After the man made some purchases, Taylor observed him exit the store and get into a pickup truck. Taylor obtained the license plate from the pickup truck.

VanDyken ran the license plate number and discovered that the truck was registered to petitioner. VanDyken obtained a photograph of petitioner from a prior arrest and prepared another photographic lineup to present to Akerityo. On February 28, 2001, Akerityo participated in a photographic lineup containing petitioner's picture. Akerityo immediately pointed to petitioner's picture and indicated "This is the

4

person who robbed me." VanDyken asked Akerityo if he was sure, to which Akerityo replied that he was one hundred percent sure. When asked how he knew, Akerityo replied "Because he was the one who robbed me. It's him."

Petitioner was arrested by the police on March 1, 2001. At the time, petitioner was wearing a jacket which was similar to the description of the jacket worn by the suspect.

A preliminary examination was conducted on March 13, 2001, at which time, Akerityo positively identified petitioner as being his assailant.

Prior to trial, petitioner moved to suppress Akerityo's in-court identification of petitioner, on the ground that it had been tainted by the fact that Akerityo had viewed the Meijer's surveillance videotape prior to identifying petitioner at the photographic lineup.

At the suppression hearing, Akerityo indicated that the parking lot of the Meijer's was well lit. Akerityo also testified that the dome light of his taxicab was turned on when petitioner got into the cab. Akerityo testified that he got a good look at petitioner as he got inside of the cab. Akerityo testified that he was able to look at petitioner in the rearview mirror as he took him to his destination.

Akerityo testified that he viewed other lineups, but indicated that the person who robbed him was not in any of those lineups. Akerityo indicated that the surveillance videotape that the police showed him did not reveal anything new to him. Akerityo, in fact, testified that the surveillance videotape was not very clear and he could not see the perpetrator's face on the video. Akerityo indicated that he picked out petitioner from a photographic lineup and based his identification of petitioner on his memory and from seeing him on the night of the robbery, not on the surveillance videotape. Akerityo subsequently identified petitioner at the preliminary examination. Akerityo indicated that he had no doubt in his mind that petitioner was the person who had robbed him.

The trial court denied petitioner's motion to suppress the in-court identification.

Akerityo positively identified petitioner as being the person who robbed him at trial. Petitioner was convicted of armed robbery and carjacking.

Petitioner's conviction was affirmed on appeal. *People v. Mitchell*, 239305 (Mich.Ct.App. June 10, 2003); *lv. den.* 469 Mich. 978; 674 N.W. 2d 156 (2003). Petitioner now seeks the

issuance of a writ of habeas corpus on the following ground:

> I. The trial court violated Nicholas Mitchell's constitutional right to due process of law by allowing tainted in-court identification testimony.

## II. Standard of Review

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. An "unreasonable application" occurs when the state court identifies the correct legal principle from a Supreme Court's decision but unreasonably applies that principle to the facts of the prisoner's case. *Williams v.*

*Taylor*, 529 U.S. 362, 412-13 (2000). A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 411.

### III. Discussion

**I. Petitioner is not entitled to habeas relief on his claim that the in-court identification was tainted by a suggestive pre-trial identification procedure.**

Petitioner claims that Akerityo's in-court identification of him as the suspect was tainted by the fact that Akerityo had previously viewed a surveillance videotape from the Meijer's store from the night of the robbery.

In rejecting this claim, the Michigan Court of Appeals indicated that the use of surveillance videotapes to identify a perpetrator to a crime is not considered impermissibly suggestive "[b]ecause such films provide a memory-refreshing device, showing the man who actually committed the robbery as opposed to the picture of some possible suspect in the police files." *People v. Mitchell,* Slip. Op. at * 1-2. In this case, the surveillance video showed the actual events that the victim had described to the police, and pictured the man who actually committed the robbery. The Michigan Court of Appeals

8

also noted that the victim testified that the surveillance video was not very clear and that he was unable to ascertain details of the suspect's features from viewing this tape. *Id.* The victim also testified that his identification of petitioner at the photographic lineup was based solely on his memory, and that he had learned nothing new from viewing the videotape. The Michigan Court of Appeals concluded that the trial court's decision to admit the victim's pretrial identification was not clearly erroneous. *Id.* at * 2.

Due process protects the accused against the introduction of evidence which results from an unreliable identification obtained through unnecessarily suggestive procedures. *Moore v. Illinois*, 434 U.S. 220, 227 (1977). To determine whether an identification procedure violates due process, courts look first to whether the procedure was impermissibly suggestive; if so, courts then determine whether, under the totality of circumstances, the suggestiveness has led to a substantial likelihood of an irreparable misidentification. *Kado v. Adams*, 971 F. Supp. 1143, 1147-48 (E.D. Mich. 1997)(citing *Neil v. Biggers*, 409 U.S. 188 (1972)). Five factors should be considered in determining the reliability of identification evidence:

> 1. the witness's opportunity to view the criminal at the time of the crime;
> 2. the witness's degree of attention at the time of the crime;
> 3. the accuracy of the witness's prior description of the defendant;
> 4. the witness's level of certainty when identifying the suspect at the confrontation; and,
> 5. the length of time that has elapsed between the time and the confrontation.

*Neil v. Biggers*, 409 U.S. at 199-200; *United States v. Gatewood*, 184 F. 3d 550, 556 (6th Cir. 1999).

A defendant has the initial burden of proving that the identification procedure was impermissibly suggestive. It is only after a defendant meets this burden that the burden then shifts to the prosecutor to prove that the identification was reliable independent of the suggestive procedure. *See English v. Cody*, 241 F. 3d 1279, 1282-83 (10th Cir. 2001)(citing *United States v. Wade*, 388 U.S. 218, 240, n. 31 (1967)). If a defendant fails to show that the identification procedures are impermissibly suggestive, or if the totality of the circumstances indicate that the identification is otherwise reliable, no due process violation has occurred; so long as there is not a substantial misidentification, it is for the jury or factfinder to determine the ultimate weight to be given to the identification. *See United States v. Hill*, 967 F. 2d 226, 230 (6th Cir. 1992).

As an initial matter, petitioner has failed to show that it was impermissibly suggestive to show the surveillance videotape to Akerityo. "[L]ittle possibility of misidentification arises from the use of photographs depicting 'the likeness not of some possible suspect in the police files, but of the [persons] who actually committed the robbery.'" *United States v. Monks*, 774 F. 2d 945, 957 (9th Cir. 1985)(quoting *United States v. Evans*, 484 F. 2d 1178, 1186 (2nd Cir. 1973)). To refresh a witness' memory from a source [that depicts the actual perpetrator of the crime] runs "a significantly smaller risk of misidentification than to refresh it from a source unrelated to the actual events." *Evans*, 484 F. 2d at 1186. In this case, it was not impermissibly suggestive for Akerityo to view the surveillance videotape which depicted him picking up petitioner at the Meijer's store prior to viewing petitioner's photographic lineup. *See United States v. Bridgefourth*, 538 F. 2d 1251, 1253 (6th Cir. 1976).

Additionally, petitioner has failed to show, under the totality of circumstances in this case, that showing Akerityo the surveillance videotape led to a substantial likelihood of an irreparable misidentification. First, as petitioner

11

himself admits, the victim in this case was able to get a good look at petitioner in a setting where the lighting was good. The victim later identified petitioner with absolute certainty at the photographic lineup, the preliminary examination, the suppression hearing, and at trial. These factors alone establish that the victim's in-court identification of petitioner was reliable. *See Brown v. Tracy,* 299 F. Supp. 2d 77, 80 (E.D.N.Y. 2004)(state court's determination that robbery victim's in-court identification of petitioner was reliable, despite suggestive identification procedures, was not contrary to, and did not represent an unreasonable application of clearly established federal law, where the victim had an unobstructed, well-illuminated view of his assailant during a robbery that lasted for approximately 15 seconds, and the victim identified the petitioner as the assailant with a high degree of certainty two months after the robbery).

Secondly, the victim testified at the suppression hearing that his identification of petitioner at the photographic lineup was based on his memory of the robbery and not from viewing the surveillance videotape. Even if it was unduly suggestive to show the surveillance videotape to the victim,

there was no substantial likelihood of an irreparable misidentification, where the victim's in-court identification was based on his independent recollection of the robbery and the carjacking rather than on the allegedly improper showing of the surveillance videotape. *See United States v. Bishop,* 66 F. 3d 569, 572, n. 2 (3rd Cir. 1995); *Collins v. Scully,* 878 F. Supp. 452, 457 (E.D.N.Y. 1995).

Third, the victim participated in one corporeal lineup and two photographic lineups involving three other suspects who matched the victim's description of his assailant and rejected these suspects as being the man who robbed him. This weighs against a finding that Akerityo's identification of petitioner was tainted by the surveillance videotape. *See e.g. United States v. Kimball,* 73 F. 3d 269, 273 (10th Cir. 1995).

In claiming that the surveillance videotape tainted Akerityo's in-court identification of him as being the perpetrator, petitioner points to the inconsistencies between the initial description by Akerityo of his attacker and the physical characteristics of petitioner. Akerityo told the police that his attacker was a white male, early 20's, 5'10", average size, with brown hair, with a possible "buzz cut", with no facial hair, wearing a thigh length dark coat and a

13

ball cap. At trial, the victim testified that his assailant's coat was green and made of cloth. Petitioner indicates that he is bi-racial, although he acknowledges that he may be perceived as being a "white male", is 5'8" and in his 20's. Petitioner points out that he has a moustache and goatee, and owns a black coat made of leather. Petitioner also points out that the man appearing in the surveillance videotape was not wearing a ball cap.

In the present case, even if there were slight discrepancies between the victim's initial description of his assailant and petitioner's appearance, this would be insufficient to render the in-court identification suspect, in light of the fact that the victim was able to get a good look at petitioner and testified that he was certain in his identification of petitioner as being the suspect. *See United States v. Hill,* 967 F. 2d at 232-33 (in-court identification of alleged bank robber held admissible despite five years between incident and trial and slight inaccuracies in witness' description of robber, where witness' view of robber was brightly lit and unobstructed and she showed high degree of certainty in her in-court identification).

In this case, the Michigan Court of Appeals'

determination that there was an independent basis for the victim's in-court identification of petitioner apart from the surveillance videotape was not an unreasonable application of clearly established federal law. Accordingly, petitioner is not entitled to habeas relief on this claim. *See Robertson v. Abramajtys,* 144 F. Supp. 2d 829, 847-48 (E.D. Mich. 2001).

## IV. Conclusion

The Court will deny the petition for writ of habeas corpus. The Court will also deny a certificate of appealability to petitioner. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel,* 529 U.S. 473, 483-84 (2000). When a district court rejects a habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484.

A federal district court may grant or deny a certificate of appealability when the court issues a ruling on the habeas petition. *Castro v. United States,* 310 F. 3d 900, 901 (6th Cir. 2002). Therefore, a district court has the power to deny a certificate of appealability *sua sponte. See Millender v. Adams,* 187 F. Supp. 2d 852, 880 (E.D. Mich. 2002).

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because he has failed to make a debatable showing that his suggestive identification claim states "a valid claim of the denial of a constitutional right." *English v. Cody,* 241 F. 3d at 1282. The Court will also deny petitioner leave to appeal *in forma pauperis,* because the appeal would be frivolous. *Allen v. Stovall,* 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).

### V. ORDER

Based upon the foregoing, IT IS ORDERED that the petition for a writ of habeas corpus is **DENIED WITH PREJUDICE.**

IT IS FURTHER ORDERED That a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**.

HON. GERALD E. ROSEN
UNITED STATES DISTRICT COURT

DATED: OCT 29 2004

PURSUANT TO RULE 77 (d), FED. R. CIV. P.
COPIES MAILED TO ATTORNEYS FOR ALL
PARTIES ON 10-29, 20 04
R.R. Saulsberry
DEPUTY COURT CLERK

16